479 A.2d 558

**COMMONWEALTH of Pennsylvania, Appellant,**

**v.**

**Felix RODRIGUEZ, Jr. a/k/a Felix Rodriquez, Jr.**

Superior Court of Pennsylvania.

Argued Feb. 22, 1984.

Filed June 22, 1984.

Petition for Allowance of Appeal Denied Jan. 7, 1985.

---

**3.** Nor did the letter indicate to whom the letter was sent.

Steven J. Cooperstein, Assistant District Attorney, Philadelphia, for Commonwealth, appellant.

Dennis J. Cogan, Philadelphia, for appellee.

Before CAVANAUGH, MONTEMURO and MONTGOMERY, JJ.

MONTEMURO, Judge:

This is a Commonwealth appeal from an order granting appellee's motion to suppress his inculpatory statement of March 14, 1981. The lower court suppressed the evidence on the grounds that it was the fruit of an illegal arrest. We disagree, and therefore, reverse.

Recently in *Commonwealth v. Lapia*, 311 Pa.Super. 264, 270, 457 A.2d 877, 880 (1983), our court concluded "that an order suppressing evidence is appealable when it is apparent from the record that the order terminates or substantially handicaps the prosecution." Applying this standard to the instant case, we are satisfied that the lower court's suppression order is appealable. Appellee is charged with murder,[1] involuntary manslaughter,[2] robbery,[3] theft,[4] possessing an instrument of crime,[5] and criminal conspiracy.[6] The record reveals that the appellee's statement is the only evidence the Commonwealth has to support the charges

1. 18 Pa.C.S.A. § 2502.

2. *Id.* § 2504.

3. *Id.* § 3701.

4. *Id.* § 3925.

5. *Id.* § 907.

6. *Id.* § 903.

against the appellee. Consequently, suppression of this statement would substantially handicap the prosecution.

The scope of review from an order suppressing evidence has recently been defined by this court as follows:

> [W]e must determine whether the evidence supports the court's factual findings and whether the legal conclusions drawn from those findings were legitimate. This determination is made considering only the evidence of the prosecution's witnesses and so much of the defense evidence as, fairly read in the context of the record as a whole, remains uncontradicted. *Commonwealth v. Kichline,* 468 Pa. 265, 361 A.2d 282 (1976); *Commonwealth v. Hunt,* 280 Pa.Super. 205, 421 A.2d 684 (1980). Findings supported by the record and legitimate legal conclusions drawn therefrom will not be disturbed. *Commonwealth v. Sparrow,* 471 Pa. 490, 370 A.2d 712 (1977).

*Commonwealth v. Williams,* 317 Pa.Super. 456, 463–464, 464 A.2d 411, 414 (1983). *See also, Commonwealth v. Webb,* 491 Pa. 329, 332, 421 A.2d 161, 163 (1980); *Commonwealth v. Lapia, supra.*

The testimony at the suppression hearing indicated the following: On March 14, 1981, at 9:46 A.M., Detectives Suminski and Lagera located the appellee outside a junk shop at Front and Cumberland Streets. They informed the appellee that they were investigating the murder of a doctor in January. They asked the appellee if he knew of the murder and they asked if he knew Russell Weinberger. When the appellee responded that he knew Weinberger, the officers asked him if he would mind going to the Police Administration Building (PAB) to talk about Weinberger. Appellee readily agreed. Detective Suminski told the appellee that he was not under arrest nor was he a suspect and that if he wanted to go to the PAB at some other time, that could be arranged.

The appellee was transported to the PAB in the detectives' unmarked police car. He sat in the back seat while the two detectives rode in the front. The back door of the

car was not capable of being locked from the outside. The appellee was not handcuffed or restrained.

On the way to the PAB, the detectives stopped at three (3) hardware stores to look for an item. Each time, the detectives went into a store together while appellee sat alone in the back seat of the unlocked car. The three men arrived at the PAB at 10:10 A.M. They entered the PAB through a door open to the general public and the appellee entered his name into a "Witness Control Book" as a witness. They proceeded to Room 104 in the PAB and then directly to an interview room in Room 104. The appellee was left alone in the room for about one-half hour before Detective Suminski entered to interview him.

The lower court, after hearing the testimony made findings of fact and conclusions of law as required by Pa.R. Crim.P. 323(i) and submitted an opinion in support of its order granting appellee's motion to suppress. The court's findings and conclusion were as follows:

## FINDINGS OF FACT

1. On January 15, 1982, Dr. Clarence Langley was found [beaten and strangled] to death in his office at [2520 Kensington Avenue], Philadelphia, Pennsylvania.

2. (a) [On February 9, 1981], as a result of an investigation, Homicide Detective Suminski, in company with Detective Lagera, went to the place where the defendant, Russell Weinberger, was staying; advised him that he was investigating the above crime and asked Weinberger to accompany him to police headquarters. Weinberger was transported in an unmarked police vehicle, was placed in the back thereof without handcuffs, and the rear doors of the vehicle could be opened by the passenger. The detectives were in civilian clothes;

(b) Weinberger was escorted into Homicide Detective Headquarters, first floor, Police Administration Building, and then into a small interrogation room. This room contained no windows, contained a desk and two chairs.

There was a door with a small window separating it from the large Administration Room;

(c) Weinberger was given no Fifth Amendment constitutional *Miranda* warnings. He gave a statement denying any involvement in the above-mentioned crime. Subsequently, he consented to take a polygraph test, which was given. He was released and returned to his residence by the aforesaid detectives.

3. (a) On March 14, 198[1], as a result of information supplied by informants discovered during neighborhood surveys and information derived from Weinberger that Felix Rodriguez "hung with" Weinberger, Det. Suminski, with Det. Lagera, sought and found Felix Rodriguez on the street at Front and Cumberland Streets, Philadelphia. They asked Rodriguez to come to police headquarters to answer questions about the death of Dr. Langley on January 15, 1981. Rodriguez agreed. He was transported, sitting in the rear seat of an unmarked police vehicle, the door of which could be opened by the passenger. He was not handcuffed. The detectives were in civilian clothes;

(b) Inside the Police Administration Building, Rodriguez was taken to Homicide Headquarters on the first floor and placed in a small interrogation room without windows. The door was closed to the main administration area. Defendant was not handcuffed. Rodriguez was advised of his constitutional Fifth Amendment rights and given *Miranda* warnings, in both Spanish and English, and indicated his understanding and willingness to waive his rights against self-incrimination by signing and/or initialing his answers in his own hand. He was warned prior to making any statement whatsoever. Rodriguez gave a statement involving himself and Weinberger in the killing of Dr. Langley on January 15, 1981. Det. Suminski, contemporaneous[ly] with Rodriguez' arrival at Homicide Headquarters, prepared a chronology in which he indicated that Rodriguez had been "ap-

prehended" at Front and Cumberland Streets at 9:46 a.m. on March 14, 1981;

(c) Rodriguez was not subjected to any threats or promises or coercion, psychological or physical. He was alert and responsive during questioning. He made no requests which were denied. He was not under the influence of alcohol or drugs, or suffering from any mental disability at all relevant times;

(d) Rodriguez was arraigned at 3:08 p.m. on March 14, 1981;

(e) [Rodriguez was not told, at any time relevant to this Motion to Suppress, that he was free to leave the Police Headquarters, or the presence of the Homicide Detectives.] [1]

4. (a) On March 17, 198[1], Detectives Suminski and Lagera arrested defendant Weinberger, pursuant to an arrest warrant issued on March 15, 1981, stating probable cause information derived from defendant Rodriguez' statement;

(b) Weinberger was given constitutional warnings against self-incrimination and knowingly, intelligently and voluntarily waived his rights against self-incrimination. He thereupon gave a statement indicating his involvement in the slaying of Dr. Langley on January 15, 1981, together with that of Felix Rodriguez;

(c) No threats, promises or coercion was exerted in order to induce Weinberger to give a statement. He was alert and responsive at all relevant times. He was not under the influence of drugs or alcohol. He was not suffering from any mental disability which would prevent him from giving a knowing, intelligent and voluntary statement;

(d) Weinberger was arraigned at 10:57 a.m. on March 17, 1981.

(Lower Court Opinion, at 2–5).

## CONCLUSIONS OF LAW

1. Defendant Weinberger's statement of February 9, 1981 was the product of custodial interrogation and was

given without required *Miranda* warnings. Weinberger was not under arrest at the time.

1. The bracketed finding was added on August 3, 1982, over the objection of the Assistant District Attorney. See N.T. August 3, 1982, pp. 6-3 to 6-13.

2. (a) The police did not have probable cause to arrest defendant Rodriguez on March 14, 1981;

(b) Defendant Rodriguez was arrested on that date and subjected to custodial interrogation;

(c) The statement given by him on that date was the product of said custodial interrogation, and the taint thereof was not purged by any factors independent of that unlawful arrest.

3. (a) The statement of defendant Weinberger on March 17, 1981, was made pursuant to a valid arrest warrant issued upon probable cause, and was given pursuant to a knowing, intelligent and voluntary waiver of constitutional rights against self-incrimination and was given knowingly, intelligently and voluntarily.

(Lower Court Opinion, at 8-9).

The appellee claims that he was placed under arrest at 9:46 A.M. and that there was not probable cause to arrest him until after he confessed to Detective Suminski at 10:49 A.M. that day. Therefore, the appellee claims the lower court properly suppressed his inculpatory statements as the product of an illegal arrest.

The Commonwealth concedes that it had no probable cause to arrest the appellee until after he confessed. The Commonwealth challenges only the propriety of the *legal* determination as to the moment of the appellee's arrest. They argue that the facts—that appellee went to the Police Administration Building voluntarily, was not handcuffed or restrained, entered the building through a door open to the public, was logged in as a witness—found and credited by the suppression judge, mandate the legal conclusion that the appellee was not under arrest at the time he confessed.

In *Commonwealth v. Lovette*, 498 Pa. 665, 671, 450 A.2d 975, 978 (1982) *cert. denied*, 459 U.S. 1178, 103 S.Ct. 830, 74 L.Ed.2d 1025 (1983), our supreme court stated:

We have defined an arrest as any act that indicates an intention to take the person into custody and subjects him to the actual control and will of the person making the arrest. *Commonwealth v. Bosurgi*, 411 Pa. 56, 190 A.2d 304 (1963). *See also, Commonwealth v. Nelson*, 488 Pa. 148, 411 A.2d 740 (1980) *citing Steding v. Commonwealth*, 480 Pa. 485, 391 A.2d 989 (1978) and *Commonwealth v. Brown*, 230 Pa.Super. 214, 326 A.2d 906 (1974); *Commonwealth v. Silo*, 480 Pa. 15, 389 A.2d 62 (1978), *certiorari denied Silo v. Pennsylvania*, 439 U.S. 1132, 99 S.Ct. 1053, 59 L.Ed.2d 94, *rehearing denied* 440 U.S. 969, 99 S.Ct. 1522, 59 L.Ed.2d 785 (1978); *Commonwealth v. Richards*, 458 Pa. 455, 327 A.2d 63 (1974).

In this case the suppression judge concluded from the findings of fact as set forth *supra*, that the appellee was under arrest at the time he confessed.

The lower court relies upon *Commonwealth v. Holmes*, 482 Pa. 97, 393 A.2d 397 (1978) in support of its determination. The facts in *Holmes* were as follows: Holmes along with a female friend went voluntarily to the Police Administration Building (PAB) in a police car, in order to assist in an investigation of a murder. Upon arriving at the PAB (shortly before 1:52 A.M.), he and his companion sat on a bench near the front door. A detective took an exculpatory statement from Holmes and at the conclusion of the interview told Holmes to return to the bench where he had been sitting. Thereafter, the detective received information implicating Holmes in the murder. Because of this information, the detective told Holmes, sometime after 3:00 A.M., to sit in an interrogation room and someone would be in to speak to him. The detective then escorted Holmes to the room and locked the door. The detective later re-entered the interrogation room to tell Holmes to stop banging on the door and someone would be in to speak with him. At 6:30 A.M. another detective entered the interrogation room

and "formally arrested" Holmes for murder and advised him of his constitutional rights. While rejecting appellant's argument that he was under arrest at 1:52 A.M. when he was told to be seated on the bench even though the detective testified that appellant was *not* free to leave, the lower court concluded on the above facts that Holmes was under arrest from the time when the detective escorted him to the interrogation room and locked the door, because these actions clearly showed an intent to place a person in custody and subject him to the control and will of an officer.

*Holmes* is clearly distinguishable from the instant case. In *Holmes* there was a marked change in status from the point when Holmes was sitting on a bench in the PAB with a companion to the point when Holmes was "escorted" by a detective to an interrogation room and locked in there alone from sometime after 3:00 A.M. until 6:30 A.M. Furthermore, in *Holmes* the detectives refused to let Holmes out of the locked interrogation room even after Holmes started banging on the door.

Here, the marked change in appellee's status occurred after he confessed. Appellee encountered the police at 9:46 A.M. and voluntarily accompanied them to the PAB. He arrived in an unmarked police car and was not handcuffed or restrained at any time. Appellee was left alone in a small interrogation room from the time he arrived at the PAB at 10:10 A.M. until the time when Detective Suminski entered to interview him at 10:45 A.M. There is absolutely no evidence that appellee was locked in the interrogation room or that he ever expressed a desire to leave the room or was ever refused any request. Furthermore, at the time Detective Suminski entered the interrogation room, appellee had been in the company of the police, whom he voluntarily accompanied for barely one (1) hour.

The suppression court found that *Commonwealth v. Horner*, 497 Pa. 565, 442 A.2d 682 (1982) and *Commonwealth v. Haggerty*, 495 Pa. 612, 435 A.2d 174 (1981) were inapposite to the present case [N.T. 5–142]; however, in our view

they are more on point than *Commonwealth v. Holmes, supra,* and more persuasive.

In *Horner,* the relevant facts were as follows: At 10:55 P.M. the police told Horner and his companions that "they were being taken to homicide as witnesses." Thereafter Horner and his companions were transported in a single police van to the PAB. None of them were frisked or handcuffed. Horner entered the Homicide Unit through the visitor's door, signed in as a witness, and was allowed to sit together with his companions in the witness waiting area. Horner's interview began at 12:35 A.M. at a desk in an open area of the Homicide Unit. The interview was completed at 1:50 A.M. Sometime thereafter between 3:30 A.M. and 4:00 A.M., when the statements of all the witnesses were reviewed the decision to arrest the appellant was made.

The court in *Horner* concluded on the above facts that Horner was "neither in custody nor the focus of any investigation at the time he gave the police his statement; that appellant [Horner] was not under custodial interrogation at the time he made his statement; that *Miranda* warnings were not necessary; and that appellant's [Horner's] statement was admissible in evidence at trial." *Commonwealth v. Horner, supra,* 497 Pa. at 575, 442 A.2d at 687.

Although *Horner* is in certain respects factually distinguishable from the instant case, it provides a strong argument for concluding that appellee was not under arrest at the time he confessed. In *Horner,* the police "told" Horner that he was going to come with them as a witness, while in the instant case appellee was asked to accompany the officers. In *Horner,* even though Horner was a "witness", he was transported to the PAB in the back of a locked police van, while appellee was transported in an unmarked police car. In both *Horner* and the instant case no restraints or handcuffs were used. In both, entrance to the PAB was made through the visitors' door and in both, the parties signed the witness log. Since the court in *Horner* concluded that there was not even a custodial interrogation

requiring *Miranda*[7] warnings, we would be hard pressed under the facts of the instant case to conclude that appellee was under arrest at the time he confessed.

In *Commonwealth v. Haggerty, supra,* two plainclothes policemen went to Haggerty's house at 11:00 A.M. Haggerty's wife woke him and the police asked if he would come to the State Police barracks to discuss an earlier statement he gave concerning a suspected arson. Haggerty agreed. Upon his arrival at the barracks, he waived his *Miranda* rights and was questioned for ninety (90) minutes but denied any involvement. He then agreed to take a polygraph test. While waiting for the polygraph examiner Haggerty and a police officer remained in the interrogation room. The polygraph test began at 2:30 P.M. About one (1) hour later, the polygraph examiner informed the original interviewing officers that Haggerty admitted his involvement in the fire.

Haggerty argued on appeal that he was arrested at 11:00 A.M. The Commonwealth argued that Haggerty was not arrested until immediately after his initial admission of involvement sometime between 2:30 P.M. and 3:00 P.M. The court in *Haggerty* concluded on the above facts that there was, "nothing which would indicate that the officers attempted to subject appellee to their will and control before appellee admitted involvement in the instant crime. It is thus our view that on this record appellee was not arrested until sometime between 2:10 p.m. and 3:30 p.m." *Commonwealth v. Haggerty, supra,* 495 Pa. at 615, 435 A.2d at 175.

■ It is evident that *Haggerty* is strikingly similar with the instant case and we find it controlling. As was the case in *Haggerty,* appellee was asked to come back with the police to be questioned. Similarly in both *Haggerty* and the instant case plainclothes police officers provided the transportation, and no restraints or handcuffs were used. In both cases *Miranda* warnings were given immediately be-

7. *Miranda v. Arizona,* 86 S.Ct. 1602, 16 L.Ed.2d 694, 384 U.S. 436 (1966).

fore questioning.[8] In both cases questioning was done in an interrogation room and not in an open area.

■ Under all of the circumstances as found and credited by the suppression court it is clear that taking appellee to homicide headquarters, placing him in a small interrogation room, without windows and with the door closed for thirty-five (35) minutes and giving him *Miranda* warnings, did not constitute an arrest as that term has been defined under our cases.

We are convinced that the principal reason for the suppression court's finding that appellee was arrested at 9:46 A.M. was the chronology prepared by Detective Suminski. This chronology prepared contemporaneously with appellee's arrival at homicide headquarters indicated that appellee was "apprehended" at Front and Cumberland Streets at 9:46 A.M. The suppression court, in our view, equated the word "apprehended" with "arrested."

Detective Suminski testified as to what he meant by his use of the word "apprehended." He said: "Well, I usually use it when somebody comes with me who [sic] I go out looking for whether they're a suspect or whether they're a defendant." (N.T., July 21, 1982, p. 232). Obviously the suppression court chose, as it had the right to do, to disbelieve the detective's explanation.

■ However, the test is not what the police intended but rather the reasonable impression conveyed to the person subjected to the seizure. *Commonwealth v. Holmes, supra,* 482 Pa. at 109–110, 393 A.2d at 403. Even assuming that Detective Suminski meant "arrested" when he used the word "apprehended", that would be of no moment absent

---

**8.** In the instant case the suppression court expressly found that appellee was given *Miranda* warnings prior to making any statement whatsoever. Lower Court opinion at 3–4. The Commonwealth in its brief at 16 argues that the suppression court's finding is unsupported by the record. Viewed in light of *Haggerty, supra,* it makes no difference under the facts of this case whether or not appellee was given *Miranda* warnings prior to making any statement whatsoever, since the mere giving of *Miranda* does not signal arrest. *See also Commonwealth v. Romeri,* 314 Pa.Super. 279, 460 A.2d 1139 (1983).

an act indicating an intention to take the appellee into custody. Not only was appellee completely unaware of the use of the word "apprehended" but more importantly we find no police conduct here which would cause appellee to believe that he was being taken into custody, or that he was not free to leave at any time before he confessed. Thus, we find that the suppression court erred in its reliance upon the chronology of events to find that appellee was arrested at 9:46 A.M. at Front and Cumberland Streets.

For all of the above reasons we reverse the order of the suppression court and remand the case for trial. This court does not retain jurisdiction.