627 A.2d 741

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Marcelette MILLER, Appellant.**

Superior Court of Pennsylvania.

Argued March 3, 1993.

Filed June 4, 1993.

Reargument Denied July 30, 1993.

412

Regina B. Diamond, Philadelphia, for appellant.

Andrew Gibson, Asst. Dist. Atty., Philadelphia, for the Com., appellee.

Before CAVANAUGH, BECK and HUDOCK, JJ.

HUDOCK, Judge:

This is an appeal from the judgment of sentence imposed upon Appellant after she was found guilty, in a non-jury trial, of two counts each of third-degree murder,[1] recklessly endangering another person,[2] and endangering the welfare of a child.[3] Timely filed post-verdict motions were denied by the trial court, and Appellant was sentenced to an aggregate six to twelve year period of incarceration, followed by a concurrent fifteen year probationary period. These convictions arose from the starvation deaths of Appellant's seven-month-old twin daughters. This direct appeal followed. We affirm.

The facts concerning the discovery of the dead infants were summarized by the trial court as follows:

On December 24, 1990, Police Officer George Hicks went to 5339 Florence Ave. in the City of Philadelphia, to investigate a report of two dead babies who were suspected

1. 18 Pa.C.S. § 2502(c).
2. 18 Pa.C.S. § 2705.
3. 18 Pa.C.S. § 4304.

victims of child abuse. Officer Hicks, a 15 year veteran of the police department, was assigned to the sex crimes unit. It is that unit of the Philadelphia Police Department which investigates instances of child abuse. He arrived at the Florence Ave. address at approximately 4:00 p.m. That location is a rowhouse where [Appellant] was residing with her mother, and seven children. Upon entering the rowhouse, the officer observed [Appellant] sitting on a sofa in the living room, with five of her children. Three or four uniformed police were already on the scene, but [Appellant] was not restrained in any way. The officer then proceeded to the second floor front bedroom where the bodies of two infants were located.

When the officer arrived in the upstairs bedroom he saw two dead infants on the bed. Their skin looked dried and wrinkled, and their stomachs were discolored. A uniformed police corporal, the medical examiner, and his investigator were also in the room at this point. The medical examiner told Hicks that the children appeared to have died from dehydration, and malnutrition, and that there were signs of some decay. [Appellant's] mother was also downstairs, and the officer did not know who lived in the house, or who was responsible for the care of the children.

Trial Court Opinion, at pp. 2–3 (citations to record omitted).

Appellant raises the following issues:

I. Was the evidence insufficient to support a verdict of murder in the third degree, where:

(A) The Commonwealth did not prove beyond a reasonable doubt that [Appellant] acted with malice, and

(B) The Commonwealth did not prove beyond a reasonable doubt that [Appellant] intended to cause serious bodily injury or death, and

(C) The state of mind involving the indifference to consequences and/or the value of human life applies equally to involuntary manslaughter and third degree murder; when either offense could apply, must not [Appellant] must be

given [sic] the benefit of the doubt and therefore be convicted only of the offense involving a lesser grade of culpability?

II. Did the trial court err in denying [Appellant's] motion to suppress the first statement, where:

(A) There was no probable cause to arrest her for recklessly endangering another person or endangering the welfare of children, and

(B) That arrest was in violation of Pa.R.Crim.P. § 101, which provides, *inter alia,* that a misdemeanor arrest may only lawfully be effected if the misdemeanor was committed in the presence of a police officer making the arrest, or such arrest without a warrant is specifically authorized by statute, or the arresting officer has a lawful arrest warrant?

III. Did the trial court err in permitting Dr. Hellman, who is qualified only as a pathologist, to interpret medical reports relating to the development of infants, and to offer opinions relating to that development?

Appellant's Brief at p. 3. We will address these issues in the order in which they are raised.

The standard of review employed in determining whether the evidence was sufficient to support a conviction is well-settled:

The test for determining the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner and drawing all proper inferences favorable to the Commonwealth, the [fact-finder] could reasonably have determined all elements of the crime to have been established beyond a reasonable doubt. *Commonwealth v. Syre,* 507 Pa. 299, 489 A.2d 1340 (1985). This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. (Citations omitted).

*Commonwealth v. Smouse,* 406 Pa.Super. 369, 376, 594 A.2d 666, 669 (1991), (*quoting Commonwealth v. Hardcastle,* 519 Pa. 236, 246, 546 A.2d 1101, 1105 (1988)). It is with this standard in mind that we review Appellant's first issue.

■ As noted above Appellant claims that the Commonwealth did not present sufficient evidence of malice. "To support a [third degree] murder conviction, the Commonwealth must prove [a defendant] committed the killing with malice aforethought." *Commonwealth v. Pigg,* 391 Pa.Super. 418, 425, 571 A.2d 438, 441 (1990), *alloc. den.,* 525 Pa. 644, 581 A.2d 571 *(citing Commonwealth v. Reilly,* 519 Pa. 550, 549 A.2d 503 (1988)). This Court has recently reiterated the definition of malice:

> Malice consists of a "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured. *Commonwealth v. Drum,* 58 Pa. 9, 15 (1868); *see also Commonwealth v. Young,* 494 Pa. 224, 431 A.2d 230 (1981) ... [Moreover] malice may be found where the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause serious bodily injury. *Commonwealth v. Wanamaker,* 298 Pa.Super. 283, 444 A.2d 1176 (1982).

*Commonwealth v. Cottam,* 420 Pa.Super. 311, 342, 616 A.2d 988, 1004 (1992) (citations omitted). As is readily apparent from the above definition, the Commonwealth was not required to prove Appellant's intent to harm her daughters as part of its proof that she acted with malice. Thus, Appellant's claim to the contrary is without merit.

■ Appellant also claims that the issue presented is whether her actions or inactions were criminally negligent (the level of culpability that would support a conviction of involuntary manslaughter) or malicious. Appellant claims that the record supports no other conclusion than the fact that she simply failed in her duty to care for her children. Appellant then asserts that, as her omission is not willful, and arose out of neglect only, it is manslaughter. We disagree.

In *Commonwealth v. Taylor,* 461 Pa. 557, 337 A.2d 545 (1975), our Supreme Court upheld the second degree murder conviction of a defendant who, while intoxicated, struck and

killed a minor on a bicycle.[4]  In rejecting the defendant's argument that a deliberate intent to harm was required to support a second degree murder conviction, the Supreme Court noted:

> [Taylor] would have us find that malice is not present unless it is established that the victim was "intentionally run down" by the operator of the vehicle.  Such a view fails to recognize the distinction between first and second degree murder.  The presence of a deliberate intent to kill while a prerequisite for murder in the first degree is not required for murder in the second degree.  As pointed out in *Commonwealth v. McLaughlin*, 293 Pa. 218, 222, 142 A. 213, 215 (1928), malice is present either where it is shown that the accused intended to strike the victim or "was recklessly disregardful of [his] safety, . . . ."  The argument of [Taylor] fails to perceive that between the recklessness or culpable negligence necessary to support the charge of involuntary manslaughter, see *Commonwealth v. Busler*, 445 Pa. 359, 284 A.2d 783 (1971), and the specific intent to kill which is a prerequisite of murder of the first degree, there is a class of wanton and reckless conduct which manifests such an extreme indifference to the value of human life which transcends the negligent killing and reaches the level of the malice which supports a verdict of murder in the second degree.

*Id.,* 461 Pa. at 564, 337 A.2d at 548.  *See also Commonwealth v. Pigg, supra* (third-degree murder convictions of drunk driver upheld).

A third degree murder conviction for failure to provide for the nourishment and care of a child has been upheld by this Court on a previous occasion.  In *Commonwealth v. Smith,* 389 Pa.Super. 606, 567 A.2d 1070 (1989), *alloc. den.,* 526 Pa. 648, 585 A.2d 468 (1990), this Court upheld the third degree murder and voluntary manslaughter convictions of Smith, a habitual cocaine user, where the death of her three-year-old

---

**4.** At the time *Taylor* was decided, second degree murder contained the same elements as present in third degree murder.  Taylor was also convicted of driving under the influence of alcohol.

daughter was caused by malnutrition. In rejecting Smith's claim that there was insufficient evidence that she caused her daughter's death, this Court noted that the medical examiner testified to a reasonable degree of medical certainty that the cause of death was malnutrition, rather than a natural cause, and that there was sufficient evidence on the record to show that Smith did more than simply fail in the duty to care for her child. Namely, the door to the room in which the dead child was found was locked from the outside and "the inside door knob was found next to the decedent which is strong circumstantial evidence that [Smith] locked the child in the room before she died." *Id.*, 389 Pa.Super. at 610, 567 A.2d at 1072.

In her post-verdict motions and her summary of argument on appeal, Smith alleged that the evidence did not support a finding of malice necessary to support a conviction for third degree murder. Because this issue was not supported with argument in the body of Smith's brief, this Court found it to be waived. In a footnote, however, this Court stated that in the absence of waiver it would find the issue to be meritless and would have affirmed the disposition of the issue on the basis of the trial court opinion.

In an attempt to distinguish *Smith*, Appellant asserts that there was evidence that Smith had a history of neglecting her daughter; when the child was fed, she was only fed once a day, Smith often screamed and cursed at the child, the neighbors often heard the child crying, that Smith locked the child in the room, and, that after Smith vacated the apartment, she left the corpse behind. Like the trial court, we are not persuaded by these distinctions. As in *Smith*, the medical examiner in the present case clearly testified that the cause of the infants' deaths was dehydration and malnutrition. Given the low weight of the infants' organs, the medical examiner concluded that the malnourishment occurred over a protracted period of time. Moreover, Appellant herself admitted that she thought her daughters were "awfully thin" and that she knew she could go to a clinic to receive free formula. The fact that Smith locked her child in a room and screamed and cursed at

her is insufficient to distinguish *Smith* from the present case, considering that Appellant's daughters were only seven-months-old and could not possibly leave the room in which they were found.

■ We are not unmindful of the fact that Appellant is a cocaine addict, but this factor does not alter our conclusion that her negligence rose to such a level as to constitute wanton and reckless conduct that demonstrates an extreme indifference to the value of human life, *i.e.*, malice. *Commonwealth v. Taylor, supra*. Just as the intoxicated operators of the vehicles which killed others in *Commonwealth v. Taylor, supra*, and *Commonwealth v. Pigg, supra*, cannot be said to have intended the consequences of their acts, so too Appellant cannot escape the unintentional consequences of her egregious inaction. Appellant's first claim is without merit.[5]

■ Appellant next claims that the trial court erred in failing to suppress her initial statement to the police. Our standard employed when reviewing the denial of a motion to suppress is also well-settled:

In reviewing an order denying a motion to suppress evidence we must determine whether the factual findings of the lower court are supported by the evidence of record. *Commonwealth v. Espada*, 364 Pa.Super. 604, 607, 528 A.2d 968, 969 (1987). In making this determination, we may only consider the evidence of the Commonwealth witnesses and

---

5. We note that Appellant cites no authority for the proposition that, because the state of mind involving indifference to consequences and/or the value of human life applies equally to involuntary manslaughter and third degree murder, she should be given the benefit of the doubt and convicted only of the offense involving a lesser degree of culpability. Moreover, this statement ignores the distinction recognized above in *Taylor*, that conduct can rise above criminal negligence and constitute malice.

We also note that Appellant cites several cases wherein the respective defendants were only convicted of involuntary manslaughter even though the facts would appear to be more egregious than the neglect of her daughters. Reliance on these cases is misplaced, however, because none of those defendants were convicted of third degree murder, and thus evidence of malice was not discussed. For much the same reasons, we find that several cases from our sister jurisdictions cited by Appellant are factually distinguishable.

so much of the witnesses for the defendant as, fairly read in the context of the record as a whole, remains uncontradicted. *Id.* If the evidence supports the findings of the lower court, we are bound by such findings and may reverse only if the legal conclusions drawn therefrom are in error. *Id. Commonwealth v. Frank,* 407 Pa.Super. 500, 502, 595 A.2d 1258, 1259 (1991).

The trial court summarized its factual findings regarding the circumstances of Appellant's first statement to the police as follows:

[Officer] Hicks then went downstairs, and told [Appellant] that her other children were going to be taken to be examined to be sure they were alright. He also told her the police "... were investigating the deaths of her children, and we were going to try to determine what led up to the deaths of her children." [N.T, 5/20/91] at 13. [Appellant] "seemed to think that was fine." *Id.* She asked if her children would be taken away, and the officer said he didn't know "if they were going to be admitted." [*Id.*] He explained, "we had to take them to the hospital and let the doctor check them out." *Id.* at 14. [Appellant] agreed to this. Police then helped [Appellant] find suitable clothing for her remaining five children. Hicks further explained that, after the children were taken to the hospital, she would be taken to the Sex Crimes Unit to try to determine the course of events that led up to the deaths of her babies. During the conversation, and while they were getting clothing for the children, [Appellant] had access to a telephone. [Appellant] agreed, and accompanied the officer to a waiting police van which had been called to transport her to the Sex Crimes Unit.

Hicks went with the children to the hospital and then proceeded to the Sex Crimes Unit where he met [Appellant] in the Operations Room. Hicks then asked [Appellant] to accompany him to a nearby interview room where he took a written statement from her after properly warning her of her rights. In her statement, she admitted that she was responsible for the care and feeding of the children, and

that they resided at the Florence Avenue address with her and her mother. Although Officer Hicks suspected that [Appellant] had a drug problem at the time of the interview, [Appellant] denied using drugs.

When [Appellant] completed the statement, Hicks informed her that she was under arrest for various misdemeanor charges.... In her statement, [Appellant] said that she had checked on the children the morning of [December] 24th. This, combined with information which the officer had received from the medical examiner that the children had been dead at least 12 hours or more, the lack of food in the house, and the condition of the remaining children caused him to place,[Appellant] under arrest. Until [Appellant] admitted that she was responsible for the children, the officer had not known who was responsible for them, or where they lived. He testified credibly that, "I may have taken her to my headquarters, she may have told me, 'I don't live there. My children all live with my mother. I just stopped in to visit. I don't have any control.'" *Id.* at 59. Following the arrest, paperwork was turned over to homicide.

Trial Court Opinion at pp. 3–5 (except were noted, citations to record and footnotes omitted).

Appellant claims that she was under arrest when she was taken to the Sex Crimes Unit building for questioning, was more likely than not handcuffed prior to being transported,[6]

6. Officer Hicks accompanied Appellant's other five children to the hospital for examination. He left Appellant with other members of the police and directed that she be taken to the Sex Crimes Unit. Upon cross-examination, Officer Hicks stated his belief that Appellant was not handcuffed for the ride down to police headquarters. Officer Hicks did concede that it was standard procedure for someone to be handcuffed when they were put in the police van and that he left no order that Appellant was not to be cuffed. Although defense counsel inquired as to whether, under these circumstances, Officer Hicks would expect that Appellant would be handcuffed, the question was twice objected to by the Commonwealth and the objection was twice sustained by the trial court. Upon further inquiry by the trial court, Officer Hicks stated that he had no specific recollection as to whether Appellant was handcuffed in the van.

was viewed as a suspect, and was not permitted to leave. Under these circumstances, Appellant claims that she was detained against her will, that there was no probable cause to arrest her, and thus that any statement she gave as a product of the unlawful arrest should have been suppressed. The trial court, as noted above, found credible the testimony of Officer Hicks that he did not know prior to her statement that she was responsible for the welfare of her daughters. The trial court further found that Appellant agreed to accompany Officer Hicks to the Sex Crimes Unit, and that Appellant was only placed under arrest after this statement was given.

Upon review, we find that the factual findings of the trial court are supported by the record. Moreover, under the factual circumstances found by the trial court, we cannot conclude that the trial court erred in its legal conclusions and its subsequent decision to deny suppression of the statement. An arrest occurs with any act that indicates an intention to take a person into custody and subject him or her to the actual control and the will of the person making the arrest. *Commonwealth v. Frank, supra.* An arrest may be effectuated without the actual use of force and without a formal statement of arrest. *Commonwealth v. Monahan,* 378 Pa.Super. 623, 549 A.2d 231 (1988), *alloc. den.,* 522 Pa. 574, 559 A.2d 36 (1989). In determining whether an arrest occurred, the test employed is an objective one; it depends upon the reasonable

Appellant was twice arrested in the present case. As found by the trial court, Appellant was initially arrested after her conversation with Officer Hicks in November, 1990. Appellant was subsequently arrested in January, 1991, on homicide charges. The majority of defense evidence presented at the suppression motion concerned a statement made to the police after her second arrest; a statement that was ultimately suppressed. After cross-examination as to the alleged coercive nature of the second police interview, the Commonwealth asked Appellant if she was handcuffed when she first spoke with Officer Hicks at the Sex Crimes Unit. In response, Appellant ambiguously stated that she was handcuffed "at one time"; she did not clarify at what time she was handcuffed. (N.T., 5/20/91, at p. 177). We also note that Appellant did not testify that she was handcuffed at any time upon direct examination. The trial court found that Officer Hicks testified credibly. Thus, we can only conclude that the trial court found Appellant's statement upon cross-examination to be either too ambiguous or incredible.

impression conveyed to a person seized and not the subjective view of the police officers or the person being seized. *Commonwealth v. Lagana*, 517 Pa. 371, 537 A.2d 1351 (1988).[7]

In the present case, the trial court found that Appellant agreed to go to the Sex Crimes Unit. While Appellant was transported to the Sex Crimes Unit in a marked police van, the trial court did not find this factor to be determinative. These facts are sufficient to support the trial court's conclusion that Appellant was not under arrest at the time she gave her first statement.[8] *See Commonwealth v. Rodriguez*, 330 Pa.Super. 295, 479 A.2d 558 (1984) (under all circumstances found and credited by suppression court, action in taking defendant to homicide headquarters, placing him in a small interrogation room, without windows and with the door closed for thirty-five minutes and giving him *Miranda* warnings did not constitute an arrest where defendant voluntarily accompanied officers, arrived in an unmarked police car, and was not handcuffed or restrained at any time); *see also Commonwealth v. Haggerty*, 495 Pa. 612, 435 A.2d 174 (1981) (defen-

7. In its opinion the trial court makes the following statement: "The facts *sub judice* illustrate the fine line that can sometimes separate 'detention,' and arrest." Trial Court Opinion at p. 14. The trial court then cites to the cases of *Commonwealth v. Holcomb*, 508 Pa. 425, 498 A.2d 833 (1985) and *Commonwealth v. Horner*, 497 Pa. 565, 442 A.2d 682 (1978). Both of these cases discuss the time at which a police detention becomes a custodial interrogation such that a suspect is required to be given *Miranda* rights. Appellant's claim is that she was under arrest as soon as she was transported to the Sex Crimes Unit. Moreover, it is undisputed that Appellant was informed of her *Miranda* rights prior to her first statement. The mere giving of *Miranda* warnings does not signal arrest, *Commonwealth v. Rodriguez*, 330 Pa.Super. 295, 479 A.2d 558 (1984). Thus, these cases, while analogous in some respects, do not address the actual issue on appeal.

8. We also note that the Commonwealth's evidence at the hearing on the suppression motion included the fact that it took twenty-five minutes to complete the statement, and that Officer Hicks offered Appellant refreshment or a break during the course of the interview.

Finally, we note that while Officer Hicks admitted, upon cross-examination, that he never *informed* Appellant that she was free to leave, contrary to Appellant's assertion on appeal, Hicks never testified that Appellant was not free to leave. Moreover, Appellant's own testimony at the suppression hearing does not indicate that she ever expressed a desire to leave or to end the interview.

dant was not under arrest when he accompanied police to barracks, waived his *Miranda* rights, and was questioned for ninety minutes; there was nothing within the record which would indicate the police attempted to subject defendant to their will and control before defendant admitted his involvement in the crime). Thus, we find Appellant's second issue to be without merit.[9]

Appellant's final claim is that the trial court erred in allowing the Commonwealth's expert, Dr. Hellman, who is a forensic pathologist, to testify as to the physiological development of children. The decision to admit or exclude expert testimony lies within the sound discretion of the trial court; the determination of the trial court will not be reversed unless an abuse of that discretion is found to exist. *Commonwealth v. Emge*, 381 Pa.Super. 139, 553 A.2d 74 (1988). Moreover, we note that when the court is sitting as fact-finder, it is presumed that inadmissible evidence is disregarded and that only relevant and competent evidence is considered. *Commonwealth. v. Davis*, 491 Pa. 363, 421 A.2d 179 (1980). Without citing authority to support the assertion, Appellant claims that knowledge of the physiological development of children is limited to the expertise of a pediatrician or an expert in pediatric development. Appellant further supports this claim by stating that the trial court placed great emphasis on Dr. Hellman's testimony regarding the low organ weights of the infants to support the third degree murder convictions despite the fact that they were born prematurely. We do not agree and find that the trial court did not err in allowing the testimony.

In Pennsylvania, a liberal standard is applied to expert testimony. As this Court has stated:

9. The trial court agreed with Appellant that her warrantless arrest was in violation of Pa.R.Crim.P. 101, inasmuch as it was for a misdemeanor not committed in the officer's presence—endangering the welfare of a child. But because it found that the first statement was made *prior* to the arrest, the illegality of the subsequent arrest did not require the suppression of that statement.

A witness who has any reasonable basis of special knowledge on a subject may testify [as an expert]. *Rutter v. Northeastern Beaver County School District,* 496 Pa. 590, 437 A.2d 1198 (1981). Under Pennsylvania law, a physician may testify as an expert in a field outside his own specialty. *Arnold v. Loose,* 352 F.2d 959 (3d C.1965), reh. den. (construing Pennsylvania law in an action brought under the Wrongful Death and Survival Acts). Once an expert shows some factual basis for his opinion, his testimony is admissible. *Kravinsky v. Glover,* 263 Pa.Super. 8, 396 A.2d 1349 (1979); *Commonwealth v. Oates,* 269 Pa.Super. 157, 409 A.2d 112 (1979). A physician need not have any field of specialization in order to be competent to offer expert testimony. *Workmen's Compensation Appeal Board v. Branch Motor Express,* 18 Pa.Commw. 262, 334 A.2d 847 (1975).

*Commonwealth v. Owens,* 321 Pa.Super. 122, 127–28, 467 A.2d 1159, 1161–62 (1983). Upon review, we find that the trial court correctly found the testimony of Dr. Hellman admissible. Initially, we note that the only pertinent question objected to was with regard to how long it would take the premature twins to "catch-up" in body weight to that of a full term infant.[10] Over objection, the trial court allowed Dr. Hellman to respond. Dr. Hellman responded that the twins should have attained normal weight within a period of one year. No objection was lodged as to the testimony that the twins had low weight organs, that an internal examination indicated extensive starvation and gross dehydration, or that, after birth, they were initially gaining weight. We also note that Dr. Hellman's testimony was corroborated by the medical records presented. Put differently, there was ample medical evidence—even excluding the one objectionable statement—from which the trial court could have concluded that the starvation and dehydration of the infants was protracted.

10. Other objections were made to the admission of photographs of the deceased infants and to the Commonwealth's final question to Dr. Hellman as to whether the girls would still be alive if they were fed. The former objections were overruled by the trial court and the latter objection was sustained.

426

Finally, as to the objectionable statement, the fact that Dr. Hellman was a forensic pathologist, rather than a pediatrician or expert in pediatric development, goes to the weight of the evidence rather than its admissibility.

Judgment of sentence is affirmed.

BECK, J., concurs in the result.