**Commonwealth v. Karper**

358

*Jean A. Engler, assistant district attorney,* for Commonwealth.

*Robert T. Yurchak,* for defendant.

NANOVIC, *J.,* December 5, 2007—On December 5, 2006, the defendant, Christopher D. Karper, confessed to Trooper David Klitsch of the Pennsylvania State Police and Detective Joseph Schatz of the Jim Thorpe Police Department that he had intentionally set three fires within the Borough of Jim Thorpe and taken $110 from the Fairview Hose Company. Defendant seeks to suppress these statements contending that they were coerced and involuntarily made. For the following reasons, we deny defendant's suppression motion.

## FACTUAL BACKGROUND

Trooper Klitsch is a deputy state fire marshal. In this position he investigates the cause and origin of fires. On December 5, 2006, he was called to investigate a fire at 1370 Germantown Road in the borough which had occurred earlier that day at the Marzen Campground. As part of this investigation, Klitsch learned of the description of a vehicle seen speeding away from the area where the fire was discovered shortly before it was reported. He also learned that a vehicle matching this description was parked outside the Fairview Hose Company.

After concluding his investigation at the scene of the fire, Klitsch, accompanied by Schatz, drove to the Fairview Hose Company. The suspicious vehicle which Klitsch had previously been apprised of was still there.

This vehicle, Klitsch had also been told, was owned by the defendant. Defendant was an active fire fighter with the Fairview Hose Company (he, in fact, responded in this capacity to each of the fires which are the subject of the criminal charges against him) and was known by Klitsch beforehand from his work training fire fighters.

Klitsch and Schatz entered the fire station, found defendant, and asked whether they could question him about another fire which had occurred three days earlier, on December 2, 2006, in a garage near where defendant resided. In response to defendant's offer to go outside and talk, Klitsch suggested that because it was cold outside, it would be easier and more comfortable to meet at the police station. Defendant was also told that he was not under arrest, and that after they spoke he would be returned to the fire station. Both officers were in plainclothes during this conversation. Defendant agreed to Klitsch's suggestion and was taken by both officers to the police station. Defendant was not frisked, handcuffed or restrained.

At the police station, defendant met with Klitsch and Schatz in a separate interview room. Before any questions were asked, Klitsch read and advised defendant of his *Miranda* warnings,[1] then handed him a printed copy of

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (prior to custodial interrogation, suspect must be advised that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of counsel, and that counsel would be appointed if he could not afford an attorney).

these warnings which defendant signed. On this form, defendant indicated that he understood each of the rights listed and, having these rights in mind, he was willing to speak with the officers. (Commonwealth exhibit no. 1.) Defendant recorded the time he signed the form as 8:20 p.m.

Before questioning defendant about the garage fire, Klitsch asked defendant where he had been that day. Defendant explained his whereabouts, none of which placed him in Germantown. When told that his car had been seen in Germantown before the fire was reported, defendant became quiet. Klitsch told defendant that if he was involved in setting the fire, he needed help; Klitsch also offered to assist defendant in getting treatment and counseling. At this point, defendant admitted he had set the fire. Defendant's description of how and when the fire was set corroborated the results of Klitsch's investigation, which had not been disclosed, and which concluded that the fire had been started on the rear wall of the structure near a window.

When next asked about the December 2 garage fire, defendant initially denied any responsibility but claimed that the fire was started by three minors he had observed smoking marijuana at the site. After Klitsch expressed disbelief over this version of the cause of the fire, defendant admitted to setting the fire. Again, his description of how and where the fire was set was consistent with the results of Klitsch's investigation. At the officers' request, defendant provided a handwritten statement admitting his part in starting both fires. (Commonwealth exhibit no. 2.) This statement was prepared without assistance from either officer.

Klitsch next asked defendant if he had any information regarding a fire which had occurred on February 4, 2006, damaging two buildings on Center Street—one at 330 Center Street, the other at 332 Center Street—which were separated by a common walkway. Defendant at first denied any direct knowledge but said that he had heard that gasoline was poured on the walkway between the two buildings. When Klitsch told defendant that this information had been kept confidential as part of his investigation and was known only to himself, Detective Schatz and the person or persons responsible for the fire, defendant confessed to starting this fire as well. Again, defendant's description of where and how the fire was set was consistent with the findings of Klitsch's investigation. Defendant also provided a second handwritten statement admitting his responsibility for this third fire. (Commonwealth's exhibit no. 3.)

After being questioned about the three fires, Detective Schatz asked defendant if he knew anything about any other incidents at the Fairview Hose Company. When defendant asked what he was referring to, Detective Schatz mentioned a theft which had been reported to have occurred on September 11, 2006. Defendant admitted taking $110 from a locked cabinet within the fire station and also described how he used this money to purchase a money order from Turkey Hill to pay for his car insurance. No written statement was prepared regarding this offense.

The entire interview with defendant took approximately one and a half hours. During this time, defendant was coherent and calm. His answers were responsive to what he was asked, and he never appeared to be confused

or to not understand what was occurring. Defendant was remorseful for what he had done and provided information that only the person responsible for the fires would know. At no time did the officers trick or deceive defendant. At no time did the defendant request to speak with an attorney or his parents. At the conclusion of the interview, defendant was formally arrested and taken before a district justice for preliminary arraignment.

## DISCUSSION

### Miranda *Waiver—Effect of Learning Disability*

Defendant initially contends that he was learning disabled and did not have the mental capacity to comprehend the meaning of the *Miranda* warnings he was given or to appreciate the consequences of waiving these safeguards. At the time defendant was questioned, he was 19 years old and in the eleventh grade. Defendant testified that he had previously failed two grades, had difficulty reading and comprehending what he read, and was enrolled in a special education program. Defendant's father corroborated this testimony.

No expert evidence was presented by a psychologist or otherwise as to defendant's mental age, his I.Q., or the extent of his capacity to waive constitutional rights based on mental or physical deficiencies. Defendant himself testified that at the time he was questioned, he understood his right to counsel and to remain silent. Though defendant denied knowing the significance of speaking to the police and how any statements he made could and would be used against him, he also admitted that since being questioned by the police, this warning

was further explained to him and he understood it. It was also undisputed that when defendant was asked by the police if he understood his *Miranda* warnings, he stated he did.

"[T]he determination of whether a defendant has validly waived his *Miranda* rights depends on a two-prong analysis: (1) was the waiver voluntary, in the sense that defendant's choice was not the end result of governmental pressure; and (2) was the waiver knowing and intelligent?" *Commonwealth v. Brown,* 400 Pa. Super. 316, 327, 583 A.2d 805, 810-11 (1990) (holding that this two-prong inquiry applies "whenever a defendant claims he was incapable of making a valid waiver because of a mental or psychological defect"), *cert. denied,* 502 U.S. 946, 112 S.Ct. 391, 116 L.Ed.2d 341 (1991); see also, *Commonwealth v. Cephas,* 361 Pa. Super. 160, 164-65, 522 A.2d 63, 65-66 (1987), *appeal denied,* 516 Pa. 616, 531 A.2d 1118 (1987), *cert. denied,* 484 U.S. 981, 108 S.Ct. 495, 98 L.Ed.2d 494 (1987). As to the second prong, "the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Cephas,* 361 Pa. Super. at 163, 522 A.2d at 65.

Whether the waiver was voluntarily given, and was knowingly and intelligently given when given, requires us to view and assess the totality of the circumstances surrounding the defendant and the interrogation, including, as applicable, the defendant's mental age, low I.Q., mental disease, limited education and general condition, as well as the duration and means of the interrogation, the conditions attendant to the detention, the attitude of the interrogator, and any and all other factors that

could drain a person's ability to withstand suggestion and coercion. See *Brown,* 400 Pa. Super. at 327, 583 A.2d at 811; *Commonwealth v. Nester,* 551 Pa. 157, 163-64, 709 A.2d 879, 882 (1998). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived." *Cephas,* 361 Pa. Super. at 163, 522 A.2d at 65. It is the Commonwealth's burden to prove by a preponderance of the evidence that the waiver was knowing and intelligent. *Commonwealth v. Fogan,* 449 Pa. 552, 558, 296 A.2d 755, 758 (1972).

On this issue, defendant expressed no difficulty to the police in understanding the questions asked of him or the warnings he was provided. He was at all times alert and responsive to the officers' questions. His demeanor, according to Klitsch, was that of a person who knew what he had done, was remorseful for his conduct, and wanted to take responsibility.

Defendant's statements, particularly his written ones, evidence a clear understanding of what he had done, that he was admitting wrongdoing, and that he understood the implications of what he was saying. These written statements are lucid and detailed. They express clearly defendant's appreciation of the seriousness and the consequences of his conduct.

We also find that at no time was defendant subjected to any threats, promises, or coercion, psychological or physical, which improperly induced him to incriminate himself. *Commonwealth v. Whitney,* 511 Pa. 232, 241,

512 A.2d 1152, 1157 (1986) ("The line of distinction between a voluntary and an involuntary confession is that at which governing self-direction is lost and compulsion propels the confession."); see also, *Commonwealth v. Jones,* 546 Pa. 161, 178, 683 A.2d 1181, 1189 (1996) (fact that suspect was read *Miranda* rights immediately prior to making statement weighed in favor of finding voluntariness). To the contrary, defendant's denials and evasive responses to the officers, corrected only when confronted with contrary evidence, indicate strongly that defendant retained the ability to independently evaluate his situation and that his decision to confess was the product of a rational and free choice.

Although we believe that defendant does indeed have learning difficulties, we are not convinced that defendant was intellectually incapable of giving a knowing, intelligent, and voluntary statement. "The mental age and condition of [a defendant] are serious considerations, but a low I.Q. and limited education are not in themselves sufficient to render the confession involuntary." *Brown,* 400 Pa. Super. at 328, 583 A.2d at 811. (citation and quotation marks omitted) A defendant need not have the training of a lawyer or the raw intelligence of a genius to be able to knowingly and intelligently waive his *Miranda* rights. "The test is whether he had sufficient mental capacity at the time of giving his statement to know what he was saying and to have voluntarily intended to say it." *Commonwealth v. Smith,* 447 Pa. 457, 460, 291 A.2d 103, 104 (1972) (applying the test to a situation where defendant claimed he was too intoxicated to understand the *Miranda* warnings). On this point, viewing the totality of the circumstances, we find defen-

dant's waiver of his *Miranda* rights to have been voluntarily, knowingly and intelligently given.[2]

## Miranda *Rights—When Applicable (Custodial Interrogation)*

Implicit in defendant's claim that his *Miranda* waiver was invalid is that *Miranda* warnings were required and, therefore, that he was in custody at the time he was questioned by the police. See *Commonwealth v. Umstead,*

---

2. "The question of voluntariness is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess." *Commonwealth v. Nester,* 551 Pa. 157, 163, 709 A.2d 879, 882 (1998). "[T]he totality of the circumstances, including any alleged inducement, must be considered in evaluating the voluntariness of a confession." *Commonwealth v. Templin,* 568 Pa. 306, 309, 795 A.2d 959, 961 (2002). The standard for measuring whether a confession is voluntary is not the narrow "but for" test (*i.e.,* would the defendant have confessed but for the threat or promise), implied by *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), quoted below, and apparently relied upon by the defendant, but a review based on the totality of the circumstances. See *Nester,* 551 Pa. at 165, 709 A.2d at 883.

"[A] confession, in order to be admissible, must be free and voluntary; that is, must not be extracted by *any* sort of threats or violence, nor obtained by *any* direct or implied promises, *however slight,* nor by the exertion of *any* improper influence. . . . A confession can *never* be received in evidence where the prisoner has been *influenced* by *any* threat or promise." *Bram,* 168 U.S. at 542-43, 18 S.Ct. 186-87. (emphasis added)

"The United States Supreme Court has explicitly declared that the quoted passage from *Bram* is not the correct standard for determining the voluntariness of a confession, instead the totality of the circumstances determine voluntariness." *Nester,* 551 Pa. at 164, 709 A.2d at 883 (citing *Arizona v. Fulminante,* 499 U.S. 279, 285, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)); see also, *Templin,* 568 Pa. at 313-14, 795 A.2d at 964.

916 A.2d 1146, 1152 (Pa. Super. 2007) (stating that *Miranda is* not implicated unless the individual is in custody *and* subjected to interrogation), *appeal denied,* 593 Pa. 733, 929 A.2d 645 (2007); see also, *Miranda,* 384 U.S. at 444 (defining a custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way"). With the defendant's underlying premise, we are not in full agreement.

"The test for determining whether a suspect is being subjected to custodial interrogation so as to necessitate

---

Defendant's argument that the statements he made were unlawfully induced and coerced by a promise made at the Fairview Hose Company to return him to the station after he was questioned cannot stand because the promise was not coercive or misleading in any way. The police did not know beforehand what defendant was going to say, or that he would implicate himself in these offenses. A voluntary confession by a defendant that he committed an offense establishes probable cause to arrest. *Commonwealth v. Edmiston,* 535 Pa. 210, 228, 634 A.2d 1078, 1087 (1993). More importantly, the officers neither promised leniency if defendant confessed nor threatened to file charges or arrest him if he did not. *Cf. Nester, supra,* (discussing that a confession extracted as a quid pro quo for a promise of leniency must be carefully examined in evaluating the voluntariness of the confession; also holding that an offer to assist a defendant in getting treatment, not conditioned on the defendant's confession, is not improperly coercive). "Encouraging a suspect to cooperate with the investigation and answer questions honestly is a permissible interrogation tactic." *Id.* at 167, 709 A.2d at 884.

Additionally, we find credible the officers' testimony that defendant's statements to them were made in their presence, without threats or deception, and we find no credibility in defendant's testimony at the suppression hearing that there was present in the police station, outside of the interview room, an unidentified police officer who threatened to harass him if he did not confess.

*Miranda* warnings is whether he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation." *Commonwealth v. Chacko,* 500 Pa. 571, 577, 459 A.2d 311, 314 (1983) (citations omitted); see also, *Commonwealth v. Boczkowski,* 577 Pa. 421, 447, 846 A.2d 75, 90 (2004). "[T]he test is not what the police intended but rather the reasonable impression conveyed to the person subjected to the seizure." *Commonwealth v. Rodriguez,* 330 Pa. Super. 295, 307, 479 A.2d 558, 565 (1984). (citation omitted)

"Police detentions only become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of formal arrest. Factors which may be considered include the basis, duration, location, and method of detention, as well as the investigative methods used. See also, *Commonwealth v. Holcomb,* 508 Pa. 425, 498 A.2d 833 (1985) (suggesting consideration of whether defendant goes to the police station voluntarily, and whether he is informed that he is free to leave)." *Brown,* 400 Pa. Super. at 325, 583 A.2d at 810. (citations and quotation marks omitted) "[T]he mere giving of *Miranda* [warnings] does not signal arrest." *Rodriguez,* 330 Pa. Super. at 307 n.8, 479 A.2d at 564 n.8.

Here, defendant was under no outward compulsion to go to the police station. He volunteered to do so after being told by the police that he was not under arrest. While at the police station, defendant manifested all of the signs of a person who was contrite and wanted to

cooperate. Not once did defendant ask that the questioning stop or did he request an attorney. Consistent with this appearance, defendant testified that during the time he was questioned at the station, he believed at all times he was free to leave.

At the time the police began their questioning of the defendant, it was evident that the police were investigating and seeking information regarding suspicious fires in the borough. It must also have been clear to the defendant early on—when the discrepancy between his reported whereabouts earlier in the day and the spotting of his vehicle in Germantown was brought to his attention—that he was a possible suspect. Knowing this, knowing also—as only he could—his own feelings of remorse and guilt for what he had done, and knowing further that he was at a crossroads and needed to make a choice between accepting responsibility for his actions and continuing to deny the intrinsic irony, and tragedy, of being a fire fighter responsible for setting the fires he fights, defendant decided it was in his best interest to fully cooperate.

Only after defendant confessed and admitted his involvement was defendant formally arrested and taken before a district justice for arraignment. At some point before this occurred and after defendant began to incriminate himself, it would have been reasonable for him to conclude that he was no longer free to leave. That he did not do so militates against us finding that he was reasonably *and* subjectively in custody prior to being arrested. That neither Klitsch nor Schatz restricted his movements nor exercised control over him prior to his arrest likewise precludes a finding that he was in the

physical custody of the police beforehand. Only after the decision to charge and transport the defendant to the district justice's office was made and conveyed to him, did defendant's status shift from that of a suspect being questioned and volunteering information to that of a suspect in custody about to be charged and under arrest.

## Miranda *Rights—Right to Counsel*

To the extent defendant also argues that his privilege against self-incrimination was violated because he was questioned while in custody and after requesting the assistance of counsel, we reject both the factual and legal predicates on which this argument is made and find it to be without merit. A defendant's right to counsel encompassed within the Fifth Amendment privilege against self-incrimination is a judicially created procedural right dependent upon the defendant being subjected to custodial interrogation. *Commonwealth v. Arroyo,* 555 Pa. 125, 133 and 141, 723 A.2d 162, 166 and 170 (1999). Defendant was not in custody at the time the statements in issue were made, and *Miranda* warnings were not necessary. Additionally, we have accepted as credible Klitsch's testimony that defendant never requested an attorney.

## CONCLUSION

In accordance with the foregoing, we hold that the Commonwealth has met its burden of proving by a preponderance of the evidence that defendant's confession was voluntary, and knowingly and intelligently given.

Defendant's omnibus pretrial motion to suppress will be denied, and the statements he made while questioned by Trooper Klitsch and Detective Schatz on December 5, 2006, will be admissible at trial.