J-A05019-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA　　:　　IN THE SUPERIOR COURT OF
　　　　　　　　　　　　　　　　　　　　　　　　　　　　:　　　　　　　PENNSYLVANIA
　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　v.　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
MICHAEL LYNN WRIGHT, JR.　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Appellant　　　　　　　　　　:　　No. 864 WDA 2019

Appeal from the Judgment of Sentence Entered May 3, 2019
In the Court of Common Pleas of Fayette County Criminal Division at
No(s):　CP-26-CR-0000870-2016

BEFORE:　BENDER, P.J.E., BOWES, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BOWES, J.:　　　　　　　　　　**FILED MAY 11, 2020**

　　　　Michael Lynn Wright, Jr. appeals from the judgment of sentence of
fifteen to forty years of imprisonment imposed after a jury convicted him of
third-degree murder, endangering the welfare of children ("EWOC"), and
recklessly endangering another person ("REAP") in connection with the death
of his daughter.　We affirm.

　　　　On February 24, 2016, Appellant's daughter, L.W. (the "victim"), a
twenty-three month old minor, was brought to Uniontown Hospital by her
mother, Andrea Dusha.　She had been living with her mother, Appellant, and
her two minor brothers.　Ms. Dusha explained to medics that the victim had
been sick and asleep in her car seat for approximately thirteen hours.　After
awaking, and while being fed, the victim's eyes rolled back into her head and

_____

[*] Retired Senior Judge assigned to the Superior Court.

she began foaming at the mouth. Ms. Dusha then rushed the victim to the hospital.

Although the victim appeared to have been deceased for some time, hospital staff nonetheless attempted resuscitation. Their efforts were unsuccessful, and the victim was pronounced dead. Due to the victim's age, small stature, and her presentation not matching the explanation given by Ms. Dusha, children, youth, and family services ("CYS") and the police were notified. An investigation followed. *See* N.T. Jury Trial, 5/7/19, at 139-41.

Police provided a courtesy transport of Appellant and his two sons to the hospital. *See* N.T. Jury Trial, 5/6/19, at 82. Despite being aware that the victim was either gravely ill or deceased, Appellant requested that they detour to a methadone clinic before continuing on to the hospital. This request was denied. At the hospital, Appellant grew more agitated and irritated. Upon seeing the victim's body, Appellant quipped, "Is this supposed to bring me closure?" N.T. Jury Trial, 5/8/19, at 47. Later, while speaking with an intake caseworker and a detective, Appellant denied checking on the victim and interrupted a question in order to ask about the victim's life insurance policy. Appellant also struggled to recall the last time that he fed the victim. Ultimately, he conceded that he rarely fed her despite being aware that the victim cried when she was hungry and that he often heard her "yell for food." N.T. Jury Trial, 5/7/19, at 150.

Additionally, text messages sent by Appellant to Ms. Dusha corroborated his statements to the case worker and police, showing that Appellant

repeatedly complained about caring for the victim and demanded that Ms. Dusha care for her. *Id*. at 87-114.

Dr. Cyril Wecht conducted the autopsy of the victim. He noted that the victim only weighed ten pounds and appeared "quite small for her age," "thin," and "undernourished." N.T. Jury Trial, 5/8/19, at 29. Medical records revealed that the victim weighed six pounds less than she had weighed a year ago. N.T. Jury Trial, 5/7/19, at 5. Dr. Wecht found multiple signs of significant and sustained malnutrition and dehydration, including: "tenting" of the soft tissue, recessed eyeballs, the absence of formed stool in the large intestine, and the development of dense metaphysical bones. N.T Jury Trial, 5/8/19, at 29-31. Additionally, the victim tested negative for the flu and her core body temperature revealed that she had been deceased for several hours before being seen at the hospital. *Id*. at 34-36.

A search warrant of the residence uncovered two-liter bottles filled with urine, along with trash strewn throughout the house. N.T. Jury Trial, 5/8/19, at 48. Subsequent investigation revealed that the water and sewage to the house had been turned off in November 2015 after assistance benefits the family had been receiving had ceased. N.T. Jury Trial, 5/7/19, at 75. Police found the victim's high chair, which was covered in diarrhea, in the bathroom. *Id*. at 66. Also, the victim's car seat was found in the "play room," which contained so many of Appellant's belongings that entry and exit was significantly impeded. *Id*. at 64-65, 70. In stark contrast, Appellant and Ms.

Dusha's bedroom contained multiple mattresses, two big screen TVs, a laptop, an X-Box, and a working internet modem. *Id*. at 68-70.

Appellant and Ms. Dusha were criminally charged in connection with the victim's death. The Commonwealth filed notice of its intent to seek the death penalty should Appellant be convicted of first-degree murder. On July 13, 2016, Appellant filed an omnibus pretrial motion seeking to sever his case from the prosecution of Ms. Dusha, to suppress his statements to police and unspecified physical evidence, and to change venue. Appellant also included a petition for a writ of *habeas corpus*, wherein he alleged that the Commonwealth had failed to present a *prima facie* case that Appellant intentionally, knowingly, recklessly, or negligently caused the victim's death. After a hearing, the trial court issued multiple orders and opinions granting Appellant's motion to sever, but denying all other issues.

Appellant proceeded to a jury trial wherein he testified in his own defense and was convicted of third-degree murder, EWOC, and REAP. He was sentenced to a term of fifteen to forty years of imprisonment and did not file post-sentence motions. Instead, this timely direct appeal followed. Both Appellant and the trial court complied with the mandates of Pa.R.A.P. 1925.

Appellant presents the following issues for our review:

1. Was there sufficient evidence that [Appellant] possessed the required mental states of malice, knowing conduct, and recklessness to support the verdicts for third-degree murder, [EWOC, and REAP,] respectively?

2. Did the trial court commit error of a constitutional magnitude when it failed to suppress the fruits of a search that was based upon a search warrant that was obtained prior to law enforcement possessing probable cause [that] a crime had been committed, and which designated all papers and electronic devices for seizure?

Appellant's brief at 5-6.

Appellant's first claim challenges the sufficiency of the evidence to support his third-degree murder, EWOC, and REAP convictions. Our standard of review when considering a challenge to the sufficiency of the evidence is:

Whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Gause*, 164 A.3d 532, 540-41 (Pa.Super. 2017) (citations and quotation marks omitted).

Third-degree murder is defined as:

All other kinds of murder other than first degree murder or second degree murder. The elements of third-degree murder, as developed by case law, are a killing done with legal malice. Malice exists where there is a particular ill-will, and also where there is a

- 5 -

wickedness of disposition, hardness of heart, wanton conduct, cruelty, recklessness of consequences and a mind regardless of social duty. Malice is established where an actor consciously disregard[s] an unjustified and extremely high risk that his action might cause death or serious bodily harm. Malice may be inferred by considering the totality of the circumstances.

***Commonwealth v. Golphin***, 161 A.3d 1009, 1018 (Pa.Super. 2017) (citations and quotations omitted); ***see also*** 18 Pa.C.S. § 2502. Accordingly, an unlawful killing with malice does not require that a defendant intend to injury or kill the victim.

Appellant alleges that the evidence was insufficient to prove the intent element of third-degree murder because he entrusted the victim to Ms. Dusha's care and had no reason to think that by doing so the victim would die. ***See*** Appellant's brief at 11. The trial court disagreed, explaining why it found that the Commonwealth presented sufficient evidence to convict Appellant of third-degree murder, as follows:

The evidence presented at trial showed that [Appellant] provided very little care for his daughter in the months leading up to her death. [The victim's] mother, Ms. Dusha, testified that she was the one who frequently provided care for their daughter. [Appellant] sent many text and email messages to Ms. Dusha where he chided her for leaving [the victim] in his care. During his interview with police, [Appellant] struggled to name foods that he fed her.

[Appellant] frequently complained in his messages to Ms. Dusha about [the victim], especially when she was crying. When [Appellant] arrived at the hospital on the day of [the victim's] death, he began asking about when he could go get methadone and about [the victim's] life insurance policy rather than about his daughter's welfare. He also showed no emotion when [the victim's] body was brought to him.

- 6 -

The cumulative evidence presented by the Commonwealth at trial portrayed [Appellant] as a man-child who was more concerned with playing video games and buying toys than providing care for his children – especially for [the victim] who eventually succumbed to not having adequate nourishment or healthcare. His behavior and his actions clearly showed a wickedness of disposition, harness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, *i.e.*, malice.

Trial Court Opinion, 8/19/19, 11. We agree with the well-reasoned opinion of the trial court.

In issuing its decision, the trial court relied, in part, upon our holding in **Commonwealth v. Smith**, 567 A.2d 1070 (Pa.Super. 1989). In that case, we found that the evidence was sufficient to support a third-degree murder conviction of a mother after her three-year old child died from malnutrition. The mother had been the sole caregiver of the child and the evidence established that the mother only fed the child once a day. In upholding this conviction, this Court explained that a parent has a duty to care for a three-year-old child, and failure to provide care can be the cause of death when a three-year-old child dies of malnutrition. **Smith**, **supra** at 1072.

Here, it is undisputed that Appellant was one of two adult individuals responsible for the care of the victim. Therefore, Appellant, like the mother in **Smith**, had an affirmative duty to care for the victim. Appellant and Ms. Dusha repeatedly failed to fulfill this duty and the victim died from malnutrition. Because the victim could not walk, talk, or feed herself, like in **Smith**, the failure of Appellant and Ms. Dusha to provide care was the cause

of her death. Whether Appellant intended to cause the victim's death or not is of no moment. Appellant's grossly reckless behavior demonstrated an extreme indifference to the value of human life. Accordingly, no relief is due.

Appellant also attacks the sufficiency of the evidence to sustain his EWOC and REAP convictions on the same grounds. Upon a review of the certified record, the parties' briefs, and the relevant law, the trial court's well-reasoned opinion properly delineates the elements that the Commonwealth needed to prove in order to convict Appellant of both offenses and describes how the evidence was sufficient to support each verdict. Accordingly, we affirm Appellant's judgment of sentence as to EWOC and REAP by adopting the well-reasoned August 16, 2019 opinion of the Honorable Linda R. Cordaro. *See* Trial Court Opinion, 8/16/19, at 11-13 (discussing the Appellant's challenges to the sufficiency of the evidence, listing the elements that the Commonwealth needed to prove in order to convict Appellant of each crime, and explaining that the Appellant's failure to feed the Victim or provide her with appropriate care in the months leading up to her death was sufficient to establish the challenged elements).

Finally, Appellant argues that the trial court erred when it failed to suppress evidence discovered during an allegedly unlawful search of his residence on the grounds that probable cause had not yet been established. *See* Appellant's brief at 15-16. Specifically, Appellant contends that the photographs taken of his home during the execution of the search warrant

and text messages retrieved from Ms. Dusha's phone, which stemmed from a different search warrant, should not have been admitted. *Id*. at 18-19. In its Rule 1925(a) opinion, the trial court found that Appellant had waived both of these claims by failing to raise them. *See* Trial Court Opinion, 8/16/19, at 13. *Id*. We agree.

"[A]ppellate review of an order denying suppression is limited to examination of the precise basis under which suppression initially was sought; no new theories of relief may be considered on appeal." *Commonwealth v. Little*, 903 A.2d 1269, 1272–73 (Pa.Super. 2006). It is well-settled that motions must be made to the suppression court with specificity and particularity, and that the suppression court's determination is to be final, except in the case of evidence not earlier available. *Commonwealth v. Freeman*, 128 A.3d 1231, 1241 (Pa.Super. 2015). *See also* Pa.R.Crim.P. 581(D) (explaining that an omnibus pretrial motion must "state specifically and with particularity the evidence sought to be suppressed, the grounds for suppression, and the facts and events in support thereof"). Thus, when a defendant's motion to suppress does not assert specifically the grounds for suppression, he cannot later complain that the Commonwealth or the suppression court failed to address a particular theory never expressed in that motion. *See Commonwealth v. Quaid*, 871 A.2d 246, 249 (Pa.Super.2005).

Here, Appellant argues that he properly preserved both of the above-referenced issues for appeal because he included a line in his omnibus pretrial motion stating that "there was no probable cause to apply for a search warrant," which immediately followed a line challenging an alleged search of Appellant's person and seizure of Appellant's belongings. *See* Appellant's brief at 19 (citing Omnibus Pretrial Motion, 7/13/16, at 2). However, nowhere in the motion did Appellant aver with specificity that the search warrant relating to his residence or Ms. Dusha's phone was invalid. This boilerplate language is especially deficient when considered in light of that fact that "approximately a dozen search warrants were issued over the course of [this] investigation." N.T. Omnibus Pretrial Motion Hearing, 3/1/17, at 37.

Moreover, even if we found this vague sentence to be specific enough to preserve Appellant's issues, he subsequently abandoned them at the evidentiary hearing by failing to challenge the validity of any of the search warrants and the underlying probable cause. Instead, Appellant averred only that his own statements were involuntarily given. The suppression court even acknowledged this fact in its opinion and order that followed the hearing:

> [Appellant's]'s omnibus pretrial motion includes a nonspecific, generic request to suppress evidence, including suppression of items removed from [Appellant]. This court notes that there was no search of [Appellant]'s person, and this issue will therefore not be discussed. Additionally, neither party has requested that this court review the affidavit of probable cause supporting the issuance of the search warrant. It appears to this court that the [Appellant[ waive[d] this issue.

Trial Court Opinion, 6/29/17, at 5 (unnecessary capitalization omitted). Accordingly, Appellant's failure to advance these particular legal theories before the trial court with specificity in his pretrial motion or at the hearing rendered them waived. No relief is due.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/11/2020

IN THE COURT OF COMMON PLEAS OF FAYETTE COUNTY, PENNSYLVANIA

CRIMINAL DIVISION

COMMONWEALTH OF
PENNSYLVANIA,

     v.

MICHAEL LYNN WRIGHT, JR.,

    Appellant.

    :
    :
    :
    :
    :
    :
    :
    :    No. 870 of 2016

## OPINION

Linda R. Cordaro, J.

### SUMMARY

Appellant was tried before a jury and found guilty of Third-Degree Murder, Endangering the Welfare of a Child, and Recklessly Endangering Another Person. Appellant was sentenced to a period of incarceration and now appeals his conviction.

### BACKGROUND

Appellant, Michael Wright, was the father of ▮▮▮▮▮▮ On February 24, 2016, ▮▮▮▮▮▮ was brought to Uniontown Hospital, where she was pronounced dead. ▮▮▮ was 23 months old at the time of her death.

As a result of ▮▮▮ death, Mr. Wright was charged with Criminal Homicide (18 Pa.C.S.A. §2501(a)), Endangering the Welfare of a Child (18 Pa.C.S.A. §4304(a)(1)), and Recklessly Endangering Another Person (18 Pa.C.S.A. §2705).

A trial was held on May 6—May 9, 2019. The following testimony was presented at trial.

Appellant, Michael Wright, is the father of three children: ██████████ born in 2010; ██████, born in 2011; and ██████, who was born on March 9, 2014. (Criminal Jury Trial Proceedings, Vol. 2 at 48.) The children's mother is Andrea Dusha, with whom Mr. Wright had a ten-year romantic relationship. (Proceedings, Vol. 2 at 48-49.) In 2016, Mr. Wright and Ms. Dusha, along with their three children, lived at 26 Collins Avenue in Uniontown. (Proceedings, Vol. 2 at 46-47.) Mr. Wright and Ms. Dusha were the only adults living in the house. (Proceedings, Vol. 2 at 56.) Mr. Wright was 32 years old in 2016. (Proceedings, Vol. 3 at 87.)

On the morning of February 24, 2016, 23-month-old ██████████ was taken to Uniontown Hospital by her mother, Andrea Dusha. (Proceedings, Vol. 2 at 78.) Resuscitation attempts were unsuccessful, and ██████ was pronounced dead. (Proceedings, Vol. 2 at 81-82.)

On February 25, 2016, Dr. Cyril Wecht performed an autopsy on ██████. (Proceedings, Vol. 3 at 25-26.) Dr. Wecht was recognized as an expert in forensic pathology. (Proceedings, Vol. 3 at 25.) Through his testimony, Dr. Wecht explained his methodology; how he performed the autopsy, the reason for the tests that he performed, and the results he obtained.

At the time of her autopsy, ██████ weighed about 10 pounds. (Proceedings, Vol. 3 at 28.) Dr. Wecht testified that ██████ was "quite small" for a child of that age. (Proceedings, Vol. 3 at 29.) Dr. Wecht concluded that the cause of ██████ death was malnutrition and dehydration. (Proceedings, Vol. 3 at 32.) Dr. Phillip Reilly, the Fayette County Coroner, determined the manner of death to be homicide. (Proceedings, Vol. 1 at 45.)

Several witnesses testified as to ██████ condition prior to her death.

First, Andrea Dusha testified that she was 34 weeks pregnant when ▓▓▓ was born. (Proceedings, Vol. 2 at 50.[1]) This was less than a full-term pregnancy. (*Id.*) ▓▓▓ weighed 3 pounds, 14 ounces at birth. (Proceedings, Vol. 2 at 51.) ▓▓▓ spent about a month at Magee Hospital after she was born. (*Id.*) Ms. Dusha and Mr. Wright began taking ▓▓▓ to a pediatrician, Dr. Daniel Church, after ▓▓▓ was discharged. (*Id.*) However, the last time either parent took ▓▓▓ to a pediatrician was when ▓▓▓ was four months old. (Proceedings, Vol. 2 at 52, 55-56.)

Mr. Wright and Ms. Dusha received benefits in 2015, including WIC benefits,[2] cash assistance, food stamps, and Social Security Income for their younger son. (Proceedings, Vol. 2 at 49-50, 52-54.) Those benefits would occasionally have to be renewed. (Proceedings, Vol. 2 at 53.) The staff at the WIC Office would weigh ▓▓▓ when she was brought in. (Proceedings, Vol. 2 at 53-54.) On March 2, 2015, ▓▓▓ weight was 16 pounds. (Proceedings, Vol. 2 at 54.)

On February 23, 2016—the night before ▓▓▓ died—Ms. Dusha testified that ▓▓▓ was not feeling well. (Proceedings, Vol. 2 at 71.) Ms. Dusha testified that ▓▓▓ had a stomach virus. (Proceedings, Vol. 2 at 72.) ▓▓▓ was not taken to a doctor. (*Id.*) Ms. Dusha then put ▓▓▓ in a carseat about half an hour before ▓▓▓ went to sleep. (*Id.*) Ms. Dusha stated that the carseat would sometimes comfort ▓▓▓, and that she liked to sleep in it. (*Id.*) Because ▓▓▓ was sick and sleeping, Ms. Dusha put her in the room with the toys in it, adjacent to the bedroom. (Proceedings, Vol. 2 at 72-73.)

---

[1] Andrea Dusha testified pursuant to a plea agreement. (Proceedings, Vol. 2 at 50.) She pleaded guilty to third-degree murder and was sentenced to 9 1/2 to 19 years of incarceration. (*Id.*)

[2] "Special Supplemental Nutrition Program for Women, Infants, and Children."

Mr. Wright did not check on ███ after she went to sleep at 9:30 PM. (Proceedings, Vol. 2 at 72-74.)

Ms. Dusha also testified that in February, 2016 the household had internet Wifi, a laptop, an X-Box, and heat and electricity. (Proceedings, Vol. 2 at 70, 75.) They did not have sewage or running water, which had been turned off since November or December of 2015. (Proceedings, Vol. 2 at 74-75.) They also stopped receiving cash assistance in November of 2015. (Proceedings, Vol. 2 at 75.)

Ms. Dusha woke up at 7:30 AM on February 24, 2016. (Proceedings, Vol. 2 at 74.) She went out for some errands and returned home around 10 or 10:30 AM. (Proceedings, Vol. 2 at 75-77.) After she got home, she went and checked on ███. (Proceedings, Vol. 2 at 77.) Ms. Dusha testified that she changed ███ diaper, put her in a blanket, took her downstairs, and started giving her some Gatorade and Pedialyte because she was not drinking milk. (*Id.*)

While Ms. Dusha was feeding ███, ███ eyes rolled back into her head and her teeth clamped down on the bottle and she started foaming at the mouth. (Proceedings, Vol. 2 at 77-78.) It was at that time that Ms. Dusha took ███ to Uniontown Hospital, where ███ was later pronounced dead. (Proceedings, Vol. 2 at 78.)

Dr. Daniel Church also testified at the trial regarding ███ condition prior to her death. Dr. Church was ███ pediatrician after she was born, although the family stopped taking her there after ███ was four months old. (Proceedings, Vol. 2 at 51.) Dr. Church testified as to his treatment of ███ soon after she was born. Even though ███ was born prematurely, in the weeks after her birth she had very good weight gain. (Proceedings, Vol. 2 at 15-16.)

Dr. Church was recognized as an expert witness in the field of pediatric medicine. (Proceedings, Vol. 2 at 12.) Appellant's trial counsel did not object to Dr. Church being recognized as an expert, nor did they inquire as to his qualifications. (Proceedings, Vol. 2 at 12.) Prior to Dr. Church taking the stand, the Commonwealth and Appellant stipulated to WIC records that show ▮▮▮▮▮ weight as 16 pounds at her one-year visit. (Proceedings, Vol. 2 at 4-6.) This was admitted as Commonwealth Exhibit 9. The WIC records also contained a growth chart. (Proceedings, Vol. 2 at 5-6.)

During his testimony, the Commonwealth asked Mr. Church about the WIC records and the growth chart. Dr. Church was familiar with the documents. (Proceedings, Vol. 2 at 20-21.) Dr. Church testified that ▮▮▮▮ was in the 46th percentile for weight on March 2, 2015, which would have been excellent weight gain. (Proceedings, Vol. 2 at 21-22.) Dr. Church then testified that, if ▮▮▮▮ had stayed at the same percentile at 23 months, she should have weighed 20 pounds. (Proceedings, Vol. 2 at 26.) Dr. Church then stated that there was no way that a child could lose six pounds in a few days from dehydration. (Proceedings, Vol. 2 at 28.)

There was also testimony and photographs regarding the condition of the residence of Mr. Wright and Ms. Dusha during February of 2016. There were toys in the dining room that Mr. Wright had purchased. (Proceedings, Vol. 2 at 62-63.) There was trash in the hallway. (Proceedings, Vol. 2 at 64-66.) There were 2-liter Mountain Dew bottles filled with urine in the hallway. (Proceedings, Vol. 2 at 64.) There was a highchair in the tub in the bathroom for ▮▮▮▮. (Proceedings, Vol. 2 at 66.) When asked what was in the highchair, Ms. Dusha responded, "[▮▮▮▮] had had an accident in it. She had, when she had been sick had diarrhea." (Id.) This was just a couple of days prior to ▮▮▮▮ passing. (Id.)

In the bedroom where all five of them slept, there were two big-screen televisions. (Proceedings, Vol. 2 at 68.) There were also kids toys, blankets, clothing, and food. (Proceedings, Vol. 2 at 67.) There were no beds, only mattresses. (Proceedings, Vol. 2 at 68.)

Finally, there was testimony at the trial regarding Mr. Wright's behavior in the year prior to ████ death. This included text and email messages he sent to Ms. Dusha over a period of several months where he demanded she bring him food and take care of errands as well as chiding her for leaving ████ in his care. (Proceedings, Vol. 2 at 88-125.) One example of a message that Mr. Wright sent to Ms. Dusha reads:

> You couldn't take ████, WTF. All three kids are up being jerks. You are doing who knows what. Didn't get the garbage out. You need to get this insurance taken care of. Go there, cry, make a scene, do something, get it on now. Call the insurance, see what the fucking problem is now, dammit. Also, oil needs changed and brakes have to get fixed. They're horrible. We paid almost $600.00. They can make sure it's done right. Every person I've talked to about this says they put them on wrong. Too tight. Too high. Something. They need to take them off and realign them Andrea, I'm serious. Stop letting them walk on you there. They need to jack your car up, take the brakes off, go from there. There is obviously a problem either in the mechanic's end or the brake quality. $600.00. I want my shit fixed. Make sure it is done today and not fucked around.

(Proceedings, Vol. 2 at 91-92.) That message was sent on September 25, 2015 (Proceedings, Vol. 2 at 96.) Another message Mr. Wright sent to Ms. Dusha reads:

> Fed the fuck up with her ass.

(Proceedings, Vol. 2 at 112-13.) The "her" in that message refers to ████ (*Id.*) That message was sent to Ms. Dusha on February 1, 2016—just a few weeks before ████ died of dehydration and malnutrition. (*Id.*)

At the hospital on the day of ████ death, Detective Donald Gmitter testified that he spoke to Mr. Wright. Detective Gmitter stated that at one point during the conversation, Mr. Wright asked about a life insurance policy on ████. (Proceedings,

Vol. 3 at 45.) Mr. Wright also asked several times about leaving to go to the methadone clinic. (Proceedings, Vol. 3 at 46.)

Detective Gmitter was also in an exam room with Mr. Wright when ███ was brought in, covered by a sheet. (Proceedings, Vol. 3 at 46-47.) When the sheet was pulled back and Mr. Wright saw ███ laying on the table, Mr. Wright asked if that was supposed to bring him closure. (Proceedings, Vol. 3 at 47.) He then asked if it was supposed to make him feel better and asked if he could leave the room. (*Id.*) After he was told he didn't need to be there, Mr. Wright immediately left the room. (*Id.*) Mr. Wright showed no emotion at all at that time. (*Id.*)

At the conclusion of the trial, the jury found Mr. Wright guilty of Third-Degree Murder, Endangering the Welfare of a Child, and Recklessly Endangering Another Person.

On May 24, 2019, Mr. Wright was sentenced to 15 to 40 years of incarceration.

## ISSUES ON APPEAL

Mr. Wright filed a timely Notice of Appeal on June 10, 2019. In accordance with Pa.R.A.P. 1925(b), this Court ordered Appellant to file a concise statement of errors complained of on appeal. Appellant raises six issues on appeal:

1) The Commonwealth presented insufficient evidence at trial to sustain Appellant's convictions beyond a reasonable doubt;

2) The verdict on all three counts was against the weight of the evidence;

3) The Court failed to suppress involuntary statements made by Appellant at the hospital;

4) The Court failed to suppress evidence that was discovered during an unlawful search of Appellant's residence;

5) The testimony of expert witness Dr. Daniel Church exceeded the scope of his treatment of the decedent; and

6) The above-errors cumulatively prejudiced Appellant.

Summarization of Appellant's Concise Statement of Errors Complained of on Appeal.

## DISCUSSION

Appellant's First Issue on Appeal is that there was insufficient evidence to convict him on all three counts. Specifically, Appellant argues that there was insufficient evidence presented at trial: 1) to support the element of malice as it pertains to Third-Degree Murder, 2) to support the element that Appellant acted knowingly as it pertains to Endangering the Welfare of a Child, and 3) to support the element that Appellant acted recklessly as it pertains to Recklessly Endangering Another Person.

To sustain a challenge to the sufficiency of the evidence, an appellant must show that the Commonwealth failed to produce evidence that establishes each material element of the crime charged and the commission thereof by the accused beyond a reasonable doubt. *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000); *Commonwealth v. Karkaria*, 625 A.2d 1167, 1170 (Pa. 1993).

In *Widmer*, the Pennsylvania Supreme Court held that "[e]vidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused[] beyond a reasonable doubt." *Widmer* at 751. Evidence is insufficient as a matter of law when the evidence offered to support the verdict is in contradiction to physical facts, or in contravention to human experience and the laws of nature. *Widmer* at 751 (citing *Commonwealth v. Santana*, 333 A.2d 876, 878 (Pa. 1975)). The fact-finder may resolve any doubts regarding a defendant's guilt "unless the evidence is so weak and inconclusive that as a

matter of law no probability of fact may be drawn from the combined circumstances." *Commonwealth v. Fortson*, 165 A.3d 10, 14 (Pa. Super. Ct. 2017) (citing *Hansley* at 416). The Commonwealth may use wholly circumstantial evidence to sustain its burden of proving every element of the crime beyond a reasonable doubt. *Fortson* at 14-15.

Third-degree murder is defined in the Crimes Code as "[a]ll other kinds of murder" other than first-degree murder or second-degree murder. *Commonwealth v. Seibert*, 622 A.2d 361, 364 (Pa. Super. Ct. 1993) (citing 18 Pa.C.S.A. § 2502). As developed by case law, the elements of third-degree murder are "a killing done with legal malice but without the specific intent to kill required in first-degree murder." *Seibert* at 364.

Malice is one of the essential elements of third-degree murder, and is the distinguishing factor between murder and manslaughter. *Commonwealth v. Young*, 431 A.2d 230, 232 (Pa. 1981). Malice is not just a particular ill will, but it exists in "every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty . . ." *Seibert* at 364 (citing *Commonwealth v. Drum*, 58 Pa. 9, 15 (1868) (emphasis omitted)). An unlawful killing with legal malice constitutes third-degree murder, even if there is no intent to injure or kill the decedent, and even if the death was unintentional or accidental. *Young* at 232 (internal citations omitted).

Malice may be inferred from attending circumstances. *Young* at 232. Acts of gross recklessness for which individuals must reasonably anticipate that death to another is likely to result satisfy the element of malice. *Seibert* at 364 (citing *Commonwealth v. Malone*, 47 A.2d 445, 447 (Pa. 1946)). Malice may also be found

where individuals consciously disregard an unjustified and extremely high risk that their actions might cause death or serious bodily injury. *Id.* (citing *Young* at 232).

Pennsylvania courts have upheld third-degree murder convictions for failure of a parent to provide nourishment and care of a child. *See, i.e., Commonwealth v. Miller*, 627 A.2d 741 (Pa. Super. Ct. 1993); *Commonwealth v. Smith*, 567 A.2d 1070 (Pa. Super. Ct. 1989). In *Miller*, the appellant was found guilty of third-degree murder when two of her children were found to have died in her home from malnutrition and dehydration. *Miller* at 743. In determining whether there was sufficient evidence of malice, the Superior Court stated, "[the appellant's] negligence rose to such a level as to constitute wanton and reckless conduct that demonstrates an extreme indifference to the value of human life, *i.e.*, malice." *Id.* at 745-46.

In *Smith*, the appellant-mother lived with her three-year-old daughter. *Smith* at 1071. The mother was a habitual user of cocaine, fed her daughter once a day, and became violent towards a former paramour whenever he would show affection towards or try to feed her daughter. *Id.* The mother would also curse and scream at her daughter. *Id.* Eventually, maintenance men found the decomposed and mummified corpse of the daughter in a room that was locked from the outside. *Id.* The medical examiner found that the cause of death was malnutrition. *Id.*

The Superior Court held that there was sufficient evidence presented to show that the mother caused her daughter's death. *Id.* at 1072. In finding so, the Superior Court noted, "[a] custodial parent has a duty to care for a three[-]year[-]old child, and failure to provide care can be the cause of death when a three[-] year child dies of malnutrition." *Id.* at 1072.

The case at hand is similar to both *Miller* and *Smith*. Mr. Wright clearly had a duty as a parent to provide nourishment and care for his 23-month-old daughter, ▮▮▮. When ▮▮▮ died at 23 months, she weighed 10 pounds—even though almost a year earlier she had weighed 16 pounds. The cause of her death was determined to be malnutrition and dehydration.

The evidence presented at trial showed that Mr. Wright provided very little care for his daughter in the months leading up to her death. ▮▮▮ mother, Ms. Dusha, testified that she was the one who frequently provided care for their daughter. Mr. Wright sent many text and email messages to Ms. Dusha where he chided her for leaving ▮▮▮ in his care. During his interview with police, Mr. Wright appeared hard-pressed to say when the last time he fed ▮▮▮ was and struggled to name foods that he fed to her.

Mr. Wright frequently complained in his messages to Ms. Dusha about ▮▮▮, especially when she was crying. When Mr. Wright arrived at the hospital on the day of ▮▮▮ death, he began asking about when he could go get methadone and about ▮▮▮ life insurance policy rather than about his daughter's welfare. He also showed no emotion when ▮▮▮ body was brought to him.

The cumulative evidence presented by the Commonwealth at trial portrayed Mr. Wright as a man-child who was more concerned with playing video games and buying toys than providing care for his children—especially for ▮▮▮ who eventually succumbed to not having adequate nourishment or healthcare. His behavior and his actions clearly showed a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, *i.e.*, malice.

Those same facts presented at trial were also sufficient to show that Mr. Wright acted knowingly with regard to Endangering the Welfare of Children and recklessly with

regard to Recklessly Endangering another Person. The crime of Endangering the Welfare of Children is defined as, "[a] parent, guardian[,] or other person supervising the welfare of a child under 18 years of age . . . commits an offense if [that person] knowingly endangers the welfare of the child by violating a duty of care, protection[,] or support." 18 Pa.C.S.A. §4304.

The crime of Endangering the Welfare of Children is a specific intent offense. *Commonwealth v. Cardwell*, 515 A.2d 311, 313 (Pa. Super. Ct. 1986). The intent element required by §4303 is a knowing violation of a duty of care. *Id.* In his Concise Statement of Errors Complained of on Appeal, Appellant argues that "[t]he evidentiary record is void of any basis for inferring that [Appellant] was consciously aware of the decedent's chronically poor health until after her death." However, the Superior Court held in *Cardwell* that, "[i]f a violation of a duty of care can include an omission, then, a person can act 'knowingly' in omitting to act with respect to that duty." *Cardwell* at 313. Here, Mr. Wright's omission to provide nourishment and care for ████ over a period of months leading up to her death was a knowing violation of a duty of care of a parent.

The crime of Recklessly Endangering another Person is defined as recklessly engaging in conduct that "places or may place another person in danger of death or serious bodily injury." 18 Pa.C.S.A. §2705. The *mens rea* required for this crime is "a conscious disregard of a known risk of death or great bodily harm to another person." *Commonwealth v. Cottam*, 616 A.2d 988, 1004 (Pa. Super. Ct. 1992) (citing *Commonwealth v. Sanders*, 489 A.2d 207, 210 (Pa. Super. Ct. 1985)). Further, "[a]cts of commission or omission by parents towards their children may create a substantial risk of death or great bodily injury." *Cottam* at 1004 (citing *Commonwealth v. Howard*, 402 A.2d 674, 676 (Pa. Super. Ct. 1979)). Mr. Wright's failure to feed ████ or provide her

with appropriate care not only created a substantial risk of death, but resulted in actual death.

For these reasons, this Court finds that Appellant's First Issue on Appeal is without merit.

Appellant's Second Issue on Appeal is that the verdict on all three counts was against the weight of the evidence. A jury's verdict is against the weight of the evidence when the verdict "is so contrary to the evidence as to shock one's sense of justice . . ." *Commonwealth v. Brown*, 648 A.2d 1177, 1189 (Pa. 1994) (citing *Thompson v. City of Philadelphia*, 493 A.2d 669, 672 (Pa. 1985)). Further, "[a]n allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court." *Widmer* at 751-52 (citing *Brown* at 1189). A new trial should not be granted just because there was conflict in the testimony, or because the judge would have arrived at a different conclusion based on the same facts. *Widmer* at 752. "Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Id.* (internal quotations and citations omitted).

This issue should be waived as Appellant raises it for the first time on Appeal. *See, In re J.B.*, 106 A.3d 76, 91 (Pa. 2014) (". . . weight of the evidence claims in criminal proceedings are waived unless they are raised with the trial court in a motion for a new trial . .") *See also*, Comment to Pa.R.Crim.P. 607 ("The purpose of this rule is to make it clear that a challenge to the weight of the evidence must be raised with the trial judge or it will be waived.").

Alternatively, even if the issue is not waived, a person being convicted of third-degree murder for failing to provide nourishment to his starving child does not "shock

the sense of justice." This Court finds that Appellant's Second Issue on Appeal is without merit.

Appellant's Third Issue on Appeal is that the Court failed to suppress involuntary statements made by Appellant at the hospital. Specifically, Appellant argues that statements he made to police officers at the hospital were involuntary given the totality of the circumstances.

This issue was addressed in this Court's Opinion and Order filed on July 5, 2017. That Opinion was in response to Appellant's Omnibus Pretrial Motion, filed on July 13, 2016. This Court refers to its prior Opinion in addressing the voluntariness of Appellant's statements to police.

Appellant's Fourth Issue on Appeal is that the Court failed to suppress evidence that was discovered during an unlawful search of Appellant's residence. Specifically, Appellant states that "there was not yet any medical information available to law enforcement sufficient to assert a criminal nexus with the decedent's death," and that the search warrant executed on February 24, 2016 to search Appellant's house was defective. Appellant's Concise Issues at 3.

This issue was also addressed in this Court's July 5, 2017 Opinion. However, this Court concluded that the issue was waived as Appellant failed to request that this Court review the Affidavit of Probable Cause supporting the issuance of the search warrant at the time of the Omnibus Pretrial Motion or at the Hearing on the Motion. July 5, 2017 Opinion and Order at 8. Pennsylvania Rule of Criminal Procedure 581 states:

> Unless the opportunity did not previously exist, or the interests of justice otherwise require, such motion [to suppress evidence] shall be made only after a case has been returned to court and shall be contained in the omnibus pretrial motion set forth in Rule 578. If timely motion is not made hereunder, the issue of suppression of such evidence shall be deemed to be waived.

Pa.R.Crim.P. (B). Pennsylvania Courts have held that the failure to raise a suppression issue prior to trial precludes its litigation for the first time at trial, in post-trial motions, or on appeal. *See, Commonwealth v. Collazo*, 654 A.2d 1174, 1176 (Pa. Super. Ct. 1995) (internal citations omitted). Further, the opportunity to raise this did previously exist, as Appellant filed an Omnibus Pretrial Motion challenging several aspects of the case. And the interest of justice would not be served by addressing this issue for the first time on appeal, as there was no evidentiary hearing on this matter.

Appellant's Fifth Issue on Appeal is that the testimony of expert witness Dr. Daniel Church exceeded the scope of his treatment of the decedent. Specifically, Appellant argues that he was "not given prior notice of the intended scope of Dr. Church's purported expertise;" that Dr. Church "offered testimony as to what the decedent 'should' weigh, hypothesized concerning reduction in weight cause by dehydration, and opined as to the symptoms of malnutrition;" and that the testimony "was given in the absence of the disclosure of any expert reports by Dr. Church other than his own records of providing pediatric care for the decent as an infant." Appellant's Concise Issues at 3-4.

At trial, Dr. Church testified as to his background and education in pediatric medicine. He was admitted as an expert in the field of pediatric medicine without objection or examination by Appellant. Dr. Church testified that he was ███████ pediatrician from soon after she was born until she was around four months old, after which time the family stopped taking ███████ to see him.

Prior to Dr. Church taking the stand, Commonwealth's Exhibit 9 was admitted into evidence by stipulation by the parties. Exhibit 9 included the WIC records that

showed ▓▓▓ weighed 16 pounds and her height was 26 inches at her one-year appointment with the WIC Office—on March 2, 2015. Exhibit 9 also included a growth chart, which corresponds height to weight for females.

During his testimony, Dr. Church was directed to Commonwealth's Exhibit 9. When asked what his assessment was of ▓▓▓ weight of 16 pounds on March 2, 2015, Dr. Church replied, "That would have been excellent weight gain." (Proceedings, Vol. 2 at 21.) Dr. Church was then referred to the growth chart, where he stated that on the March 2015 visit, ▓▓▓ would have been in the 46th percentile for weight per length.

Dr. Church then testified that the growth charts are universally recognized in the medical community, including the pediatric medical community. Dr. Church testified that if ▓▓▓ had stayed at the same percentile as she was at the WIC visit, she would have weighed about 20 pounds at 23 months. Dr. Church then testified that he did not believe that a 23-month-old child could have died at 10 pounds solely as the result of dehydration.

Pennsylvania Rule of Evidence 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> (c) the expert's methodology is generally accepted in the relevant field.

Dr. Church's testimony regarding what ▓▓▓ would have weighed at 23 months if she had stayed at the same percentile was properly admitted into testimony as an expert opinion.

First, Dr. Church possesses knowledge in the field of pediatric medicine that is beyond that of an average layperson. Dr. Church was properly qualified as an expert witness, and Appellant did not object to his being recognized as an expert in the field of pediatric medicine.

Second, Dr. Church testified that the charts he interpreted in order to reach the conclusion that ███ would have weighed about 20 pounds if she had stayed at the same percentile at 23 months as she was at one year are universally accepted in the field of pediatric medicine.

Third, Dr. Church's testimony helped the triers of fact to understand evidence and determine facts at issue. The ultimate issue in this case was whether Mr. Wright was responsible for the death of his 23-month-old daughter. ███ cause of death was determined to be malnutrition and dehydration. Dr. Church's testimony regarding what ███ should have weighed was relevant as to whether she was provided nourishment during the months leading up to her untimely death.

It is worth noting that after ███ one-year appointment at the WIC Office—when ███ weighed 16 pounds and was in the 46th percentile for weight to length—there does not appear to be any records of ███ weight. ███ parents stopped taking her to a pediatrician, or, apparently, to the WIC Office. Because of that, there is no indication of when ███ started to lose weight. That ███ lost 6 pounds in the 11 months between her last WIC Office visit and her death is a significant factor in concluding that Mr. Wright failed to provide nourishment for his daughter.

Appellant's Sixth Issue on Appeal is that the above-errors cumulatively prejudiced Appellant. Because Appellant's other issues raised on appeal are without merit, there cannot be cumulative error against Mr. Wright.

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that the judgment and sentence of Michael Wright should be AFFIRMED.

BY THE COURT:

ATTEST:

_Linda R. Cordaro_
Linda R. Cordaro, Judge

Clerk of Courts

Dated: August 16, 2019

FILED

2019 AUG 19 PM 3: 41

FAYETTE COUNTY
CLERK OF COURTS